Adam Tunning
MOULTON BELLINGHAM PC
27 North 27th Street, Suite 1900
P. O. Box 2559
Billings, Montana 59103-2559
Telephone: (406) 248-7731
Fax: (406) 248-7889
Adam.Tunning@moultonbellingham.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ELITE WOUND CARE CONSULTANTS, LLC,<br><br>                      Plaintiff,<br><br>-vs-<br><br>VENTURE MEDICAL, LLC,<br>                      Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff, Elite Wound Care Consultants, LLC, sues Defendant Venture Medical, LLC, and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for breach of contract, tortious or intentional interference with existing and prospective business relationships, and unjust enrichment for damages exceeding $1,200,000.00.

## PARTIES, JURISDICTION, AND VENUE

2. Plaintiff, Elite Wound Care Consultants, LLC ("Elite"), is a Delaware limited liability company with its principal place of business located at 340 9th St. N. #241, Naples, FL 34102. Elite also maintains offices in Arizona.

3. Defendant, Venture Medical, LLC ("Venture"), is a Montana corporation with its principal offices located at 211 N. Higgins Ave, Suite 305, Missoula, MT 59802.

4. As set forth in Paragraph 1, the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. This Court has jurisdiction pursuant to 28 U.S.C.§ 1332 because Elite and Venture are citizens of different States, and the matter in controversy exceeds the sum or value of $75,000.00, excluding interests and costs.

6. Venue is proper in Missoula County, Montana because Venture is based in Missoula County, Montana, the contract between the parties stipulates that all disputes shall be submitted to the federal and state courts within Missoula County, Montana, and because a significant portion of the acts and omissions that gave rise to this action occurred in Missoula County, Montana.

## FACTS AND ALLEGATIONS

7. Elite is a sales agent and distributor of medical supplies, including biologics and medical devices, and specializes in products related to the treatment of wounds.

8. Elite has been a trusted sales agent and distributor of medical supplies for over four years. Over the course of those four years, Elite has built an extensive and loyal customer base of medical providers across Florida and Arizona. These customers turn to Elite because of its longstanding relationships and superior expertise.

9. To meet the demands of its growing customer base, Elite also built a network of biotechnology companies that are able to provide the type and quality of products Elite's customers require. One of these companies is Merakris Therapeutics ("Merakris").

10. Merakris is a clinical stage biotechnology company that manufactures amniotic membranes, including the Dermacyte Amniotic Wound Care Matrix ("Dermacyte Matrix"), which is generally used to treat serious wounds. The Dermacyte Matrix can be applied to various hard-to-heal wounds and vastly increases the healing rate such that 80% of wounds heal within ten weeks.

11. Prior to April 2023, Merakris was a core partner of Elite. Indeed, for years, Merakris had a successful business relationship with Elite, and Elite, in turn, sold the Dermacyte Matrix to its network of medical providers.

12. In or around April 2023, however, Merakris changed its business model. As a result of that change, Merakris would only sell Dermacyte Matrix through select authorized distributors and suppliers.

13. Merakris named Venture as one of its authorized distributors.

14. Consequently, rather than purchasing products directly from Merakris as it had always done, Elite was now required to enter into a Sales Agency Representation Agreement with Venture if it wanted to continue to sell Merakris products.

15. On or about April 5, 2023, Elite and Venture entered into a valid and enforceable written agency agreement (the "Agreement"). A copy of the Agreement is attached at Exhibit 1.

16. Although the copy of the Agreement attached at Exhibit 1 does not include a signature on behalf of Venture, the Agreement was fully executed by both parties. Indeed, the parties both performed in accordance with the terms of the Agreement from April, 2023 to October 5, 2023. The term of the Agreement was supposed to run until December 31, 2023, and provided for automatic renewals for successive one-year terms thereafter. *See* Article 9.1.

17. The Agreement provides that Elite would sell the Merakris Dermacyte Matrix to its customer base of medical professionals and would receive a commission of 36% on "all orders solicited by [Elite] from the Customer that have been accepted by VENTURE and for which sales invoices have been submitted with purchase orders issued." *See* Agreement, Article 4-5.

18. Under the terms of the Agreement, Elite submits the Delivery Orders from its customers to Venture within 48 hours of a sale. Venture then provides Elite informational copies of all commissionable orders and renders invoices directly to the customers, and all payments are to be made directly to Venture. *See* Agreement, Article 5.3-5.4.

19. Further, Article 5.5 states that orders will only be shipped "on confirmation of ABT transfer or Credit Card payment which should eliminate any collection efforts."

20. The Agreement also contains a mutual non-solicitation provision that forbids either Party from soliciting the other's respective customers not only during the term of the relationship, but also for a period of twelve months after non-renewal or termination. *See* Agreement, Article 11.

21. During the initial months of the parties' relationship under this Agreement, Elite did not make any complaints. However, in or around August of 2023, Venture learned that Elite was potentially transitioning to selling a different

wound membrane product that was not manufactured by Merakris or sold by Venture.

22. Around the same time, Venture was pursuing a new partnership of its own with the company known as Amniowrap. Under this new partnership arrangement, Venture would sell directly to medical providers, increasing its profits by no longer having to pay commission to a sales agency.

23. However, as part of its new partnership with Amniowrap, Venture would not have access to Elite's established customer base.

24. In addition, because Elite was offering an alternative product line to its customers, Venture was also likely to face a drop in sales of the Dermacyte Matrix.

25. Also, due to Elite's success in selling the Dermacyte Matrix, Venture owed Elite approximately $1,200,000.00 in commissions based on over $3 million in sales by Elite (as of early October).

26. As a result of the foregoing, Venture sought to improperly terminate the Agreement prematurely based on patently false pretenses.

27. On October 5, 2023, just days after Elite had signed a separate contract with another manufacturer, Venture notified Elite that it was terminating the Agreement because Elite had allegedly breached Article 3.3 of the Agreement by engaging in "non-compliant marketing practices."

28. Venture's claim that Elite breached Article 3.3 of the Agreement is demonstrably and categorically false.

29. Even though there was no lawful basis to terminate the Agreement—and even though Venture knew full well this to be the case—it nonetheless used the improper and premature termination as a pretext to avoid paying Elite the money it owed for commissions.

30. Venture also used the termination to attempt to steal Elite's customers so that it could attempt to sell its own products directly to them.

31. Pursuant to Article 9.2 of the Agreement, even if Venture terminated the Agreement for cause, Venture was still required to pay Elite its commissions for sales made prior to the termination *unless* Venture did not receive payment within 60 days of termination. *See* Agreement, Article 9.2.

32. Venture intentionally and strategically refused to pursue collection of Elite's sales revenue during the 60-day termination period in an effort to deprive Elite of commission on those sales.

33. To date, despite there being in excess of $3 million in sales generated by Elite at the time Venture terminated the contract and, on information and belief, supplies having been shipped pursuant to these sales, Venture has not paid Elite any of the commission owed for these sales.

34. Under the terms of the Agreement, these supplies should not have been shipped until confirmation of ABT transfer or Credit Card Payment. Therefore, the shipping of supplies evinces either that collection has been made, triggering Venture's obligation to pay Elite its commission, or bad faith on Venture's part by waiving this requirement to avoid its contractual obligations to Elite. *See* Agreement, Article 5.5.

35. Through these deceitful and exploitative tactics, Venture breached the Agreement, breached its obligation of good faith and fair dealing, and unjustly enriched itself by pocketing the full proceeds of Elite's sales without paying the required commissions.

36. Venture's actions against Elite have been in bad faith and with the specific knowledge and intention of depriving Elite of its rightful commission.

37. Venture has also attempted to steal Elite's customers in blatant disregard of the Agreement's mutual non-solicitation provision at Article 11, and well-established common law prohibitions against tortious or intentional interference with business relations and intentional interference with prospective economic advantage.

38. Specifically, the Agreement's non-solicitation provision prohibits Venture from soliciting sales from any customer or prospective customer to which

Elite marketed or sold products to on behalf of Venture for a period of 12 months from termination. *See* Agreement, Article 11.

39. Venture has repeatedly violated the non-solicitation provision by calling, emailing, and otherwise inducing Elite's customers to end their relationship with Elite and instead contract with Venture.

40. Article 10(b) of the Agreement also prohibits the disclosure of the reason for the termination of the Agreement.

41. Venture breached this provision as well. Venture has contacted distributors and disclosed Venture's claimed reasons for terminating the contract and falsely accused Elite of stealing Venture's customers and trying to sell Venture's products without authorization. Venture has taken these actions and breached the Agreement in order to induce the distributors not to do business with Elite.

42. Venture's breaches of the Agreement have caused substantial harm and damage to Elite.

43. In addition to damaging Elite, Venture has also realized a massive financial windfall for itself, thereby unjustly enriching itself at Elite's expense.

44. Consequently, through this lawsuit, Elite seeks damages for the substantial harm caused by Venture's breach and deceptive business dealings.

45. Pursuant to Article 15.3 of the Agreement, if Elite is the substantially prevailing party in this action, it is entitled to "to reimbursement of expenses incurred … including court costs and reasonable attorneys' fees."

46. All conditions precedent for this action have been met or satisfied.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT: UNPAID COMMISSIONS

47. Elite repeats and realleges, as if set forth fully herein, the allegations of paragraphs 1 through 46.

48. The Agreement signed by Elite and Venture was a valid and enforceable written contract.

49. Venture terminated the Agreement for cause on October 5, 2023, by letter. This termination was under false pretenses.

50. Under the plain terms of the Agreement, if Venture cancels the Agreement for cause, it is still obligated to pay commissions on sales made on or before the termination and for which payment is received within 60 days. *See* Agreement, Article 9.2(d).

51. Despite there being in excess of $3 million in sales at the time Venture terminated the Agreement, Venture has not paid Elite *any* of the commission owed for these sales.

52. Venture's failure to pay this outstanding commission is a breach of Article 9.2 of the Agreement.

53. This breach is material and has caused substantial economic harm and damage to Elite.

54. Elite has fully performed all the services it agreed to perform under the Agreement.

55. Further, pursuant to Article 15.3 of the Agreement, if Venture is found to be in breach of the Agreement, Elite is entitled to reimbursement of expenses, including court costs and reasonable attorneys' fees in relation to this action.

### COUNT II – BREACH OF CONTRACT: VIOLATION OF NON-SOLICITATION PROVISION

56. Elite repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 through 55.

57. Venture has breached the Agreement by violating the mutual non-solicitation provision at Article 11.

58. Immediately after terminating its Agreement with Elite, Venture began contacting Elite's current and prospective customers in order to solicit their business and sell products to the customers.

59. In one such solicitation, made the day after Venture's termination of the Agreement, Venture emailed one of Elite's customers informing them that Venture

had terminated Elite and offered a "direct relationship" with Venture following Elite's removal.

60. Venture's brazen and duplicitous solicitation is prohibited by the clear language of the non-solicitation provision and thus constitutes a breach of the Agreement.

61. Elite suffered actual and consequential damages from Venture's breach in an amount to be determined at trial.

62. Further, pursuant to Article 15.3 of the Agreement, if Venture is found to have breached the terms of the Agreement, Elite is entitled to reimbursement of expenses, including court costs and reasonable attorneys' fees in relation to this action.

### COUNT III – BREACH OF CONTRACT: VIOLATION OF CONFIDENTIALITY PROVISION

63. Elite repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 through 62.

64. Venture has also breached the Agreement by violating the confidentiality provision at Article 10.

65. Immediately after terminating its Agreement with Elite, Venture began contacting Elite's distributors and prospective distributors in order to convince these distributors to stop or forego doing business with Elite.

66. These communications included disclosing Venture's purported reasons for terminating the Agreement, in addition to false allegations that Elite was stealing Venture's customers and trying to sell Venture's products without authorization.

67. Venture's bad faith disclosure of the reasons behind the termination is prohibited by the clear language of the confidentiality provision and violated the Agreement and breached its duty of good faith and fair dealing.

68. Elite suffered actual and consequential damages from Venture's breach in an amount to be determined at trial.

69. Further, pursuant to Article 15.3 of the Agreement, if Venture is found to have breached the terms of the Agreement, Elite is entitled to reimbursement of expenses, including court costs and reasonable attorneys' fees in relation to this action.

**COUNT IV – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

70. Elite repeats and realleges, as if set forth fully herein, the allegations of paragraphs 1 through 69.

71. Pursuant to Mont. Code Ann. § 28-1-211 and established precedent, the implied covenant of good faith and fair dealing is incorporated into every contract and requires honesty in fact and observance of reasonable commercial standards of fair dealing in the trade.

72. A breach of this covenant constitutes a breach of the underlying contract.

73. In this matter, the Agreement requires Venture to pay Elite its commission for all sales made prior to the termination of the Agreement and for which collections were made within 60 days of termination.

74. The Agreement also requires Venture to collect payment for sales made by Elite and provides that collection will occur prior to the shipment of products.

75. Venture abused the discretion conferred by the contract and acted dishonestly and outside the bounds of accepted commercial practices when it purposefully delayed its collection of invoices for sales made by Elite prior to the termination of the Agreement in a blatant attempt to skirt its contractual duty to pay Elite commission for these sales.

76. Elite justifiably expected that Venture would not abuse its responsibilities and discretion conferred by the Agreement. Accordingly, this purposeful delay violated Venture's duty of good faith and fair dealing implicit in the Agreement and caused material harm and damage to Elite.

77. Elite has fully performed all the services it agreed to perform under the Agreement.

78. Venture is therefore liable for the full amount of commission owed on all outstanding sales made on or prior to the termination of the Agreement on or around October 6, 2023.

79. Further, pursuant to Article 15.3 of the Agreement, if Venture is found to be in breach of covenant of good faith and fair dealing, Elite is entitled to reimbursement of expenses, including court costs and reasonable attorneys' fees in relation to this action.

### COUNT V – INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

80. Elite repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 through 79.

81. Over the course of its four years of existence and during the contractual period beginning in April 2023, Elite established advantageous business relationships with its existing customers as evidenced by a regular and repetitive course of business transactions with those identifiable customers.

82. Venture knew of Elite's advantageous relationships with current and prospective customers. Indeed, Venture had over six months of documented sales from working with Elite's customers.

83. As a result, Venture was able to identify these customers by name and location.

84. Despite knowledge of Elite's business relationships with its customers, Venture intentionally, tortiously, and unjustifiably interfered in Elite's business relations with its customers by soliciting and encouraging those customers through mail and phone calls to cease business relations with Elite and instead contract to purchase the products previously purchased through Elite directly from Venture.

85. Venture's actions were fueled by the motive to advance Venture's own economic advantage by harming Elite's business relationships with customers, calculated to actually achieve that end, resulted in reasonably foreseeable damage, undertaken without right or justifiable cause, and were therefore improper under Montana law.

86. As a direct and proximate result of Venture's intentional and unjustified interference with Elite's advantageous business relations with its existing and prospective customers, Elite and its customers have suffered harm.

87. Elite has suffered actual and consequential damages in the form of lost profits, the negative impact on its business relationships, the negative impact on its value and business, and damaged prospects with potential new customers and distributors. Only an amount that covers these losses will fairly and adequately compensate Elite for the damage that was caused by Venture's intentional interference.

## COUNT VI – UNJUST ENRICHMENT

88. Elite repeats and realleges, as if set forth fully herein, the allegations of paragraphs 1 through 87.

89. This Count is alleged in the alternative to Counts I and IV.

90. Elite conferred a direct benefit on Venture in that, from in or around April 6, 2023, to October 5, 2023, Venture profited from the sales revenue that Elite generated.

91. Specifically, at the time Venture terminated the Agreement in or around October 5, 2023, there were approximately $3 million in sales revenue that Elite generated for Venture's benefit but for which Elite has not been paid any commission.

92. During the relevant period, Venture was aware that: (1) Elite was a Sales Agent for Venture; (2) Elite was actively selling the Dermacyte Matrix to customers on Venture's behalf and for Venture's direct profit; (3) Elite was entitled to and expected to be paid its 36% commission and/or fair, reasonable, usual, and customary rates for its services; (4) Elite had generated over $3 million in sales prior to Venture's termination of the agreement; and (5) Elite had not agreed to forego its payments.

93. Despite these facts, Venture has refused to pay Elite over $1.2 million in commission on those sales while also unjustly retaining the full revenue from these sales, effectively allowing Venture to pocket millions in unpaid commission.

94. Under these circumstances, it would be inequitable for Venture to fail to pay Elite the fair value of the services it rendered to Venture, while retaining the benefits Elite directly conferred upon Venture.

**WHEREFORE**, Elite requests that this Court enter judgment against Venture and award Elite damages, plus interest, costs, and fees, and all other just and equitable relief that this Court deems just and proper.

## JURY DEMAND

Elite hereby demands a trial by jury on all issues triable in this complaint.

Dated: September 3rd, 2024                                    Respectfully Submitted,

*/s/Adam J. Tunning*
ADAM J. TUNNING
Montana Bar No. 12212
MOULTON BELLINGHAM PC
27 North 27th Street, Suite 1900
PO Box 2559
Billings, MT 593103
Telephone: (406) 248-7731
Adam.Tunning@moultonbellingham.com

CHRISTOPHER S. SUNDBY
Florida Bar No. 1026060
csundby@gsgpa.com
ADAM M. SCHACHTER

18

Florida Bar No. 647101
aschachter@gsgpa.com
DAVID J. PETRANTONI
Florida Bar No. 1041507
dpetrantoni@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
One Southeast Third Avenue, Suite 2600
Miami, Florida 33131
Telephone: (305) 728-0950
E-service: efilings@gsgpa.com

*Counsel for Plaintiff Elite Wound Care, LLC*